IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
ERIC MOTTO                      :      CIVIL ACTION
                                :
           v.                   :
                                :
WAL-MART STORES EAST, LP        :      NO. 11-2357
```

MEMORANDUM

McLaughlin, J.                                    May 3, 2013

           This employment discrimination suit arises from the

defendant's decision to terminate the plaintiff, Eric Motto.

Motto argues that his former employer, Wal-Mart Stores East, LP

("Wal-Mart") terminated him on account of his race in violation

of Title VII of the Civil Rights Act of 1964 ("Title VII"), the

Pennsylvania Human Relations Act ("PHRA"), and 42 U.S.C. § 1981,

and in retaliation for previously lodging complaints of

discrimination with both Wal-Mart and governmental authorities,

also in violation of § 1981.  Wal-Mart has moved for summary

judgment on Motto's discrimination and retaliation claims

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

           After holding oral argument, the Court will grant Wal-

Mart's motion.


I.    Summary Judgment Record

           The facts described herein are undisputed unless

otherwise noted.  Inferences are drawn in the light most

favorable to Motto, the non-moving party.  Am. Eagle Outfitters

v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

    A.    Motto's Employment with Wal-Mart

         In March 2007, Motto began working as an assembler at
the Wal-Mart retail store in Temple, Pennsylvania.  PX A (9/7/11
Motto Dep.) at 13, 17.[1]  Motto self-identifies as mixed race,
Caucasian and African American, and noted that racial identity on
his initial employment documents with Wal-Mart.  Motto worked
with three other assemblers at Wal-Mart, including Mike
Minicozzi, who is Caucasian.  Id. at 10-11, 76-77, 90-91.  When
Motto began working at the Temple store, Elmer Clark was the
store manager.  Clark is also Caucasian.  Id. at 68.

         As an assembler at Wal-Mart, Motto generally worked in
the receiving area at the back of the store, putting together
merchandise for customers.  He also answered customer questions
regarding Wal-Mart products and assisted customers by carrying
their purchases to their cars.  Id. at 15-17, 79.  When Motto
applied for a position at Wal-Mart's Temple store, he stated that
he was available to work during the evenings.  Once employed,
Motto generally worked an evening shift lasting until between
9:00 p.m. and 11:00 p.m., although his schedule varied.  Id. at

---

         [1] "PX" refers to the exhibits submitted by Motto as part of
his opposition to Wal-Mart's motion for summary judgment, and
"DX" refers to the exhibits submitted by Wal-Mart in support of
its motion.

71, 91.  Scheduling assignments were made on the basis of employees' availability and "customer traffic."  Id. at 108; PX H (Assoc. Customer Serv. Scheduling Availability Form).

In June 2007, Motto transferred to a service technician position at the Temple Wal-Mart.  PX A at 93.  While in that position, one of Motto's co-workers, Jay, called him a "nigger" and frequently used that term around Motto, even after Motto objected.  Motto reported his co-worker's behavior to his supervisors at the time, individuals named Tim and Suzanne. Suzanne told Motto that they would "take care of it" and that Motto did not need to continue working with Jay if he did not want.  Approximately a week or two later, human resources personnel informed Motto that Jay was terminated.  Motto returned to his assembler position in October 2007.  Id. at 84-87, 106.

B.   Motto's Requests to Change Shifts

At some point in 2008, Motto became the bass player for a studio band called Flight 106.  Flight 106 rehearsed several times a week, and rehearsals began no later than 7:30 p.m.  Id. at 41-42, 45, 113.  To accommodate his band's rehearsal sessions, in February 2008, Motto submitted a scheduling form to Clark requesting that his work schedule be limited to shifts between the hours of 7:00 a.m. and 7:00 p.m.  Id. at 108-09.  The form stated that a scheduling request did not guarantee the requesting

-3-

employee a particular shift.  PX H.

Over the next two months, Motto continued to be assigned evening shifts at Wal-Mart.  He also learned that the shift request had not been placed in his personnel file.  On April 24, 2008, Motto filled out another scheduling availability form, again requesting shifts only between the hours of 7:00 a.m. and 7:00 p.m., and gave it to his immediate supervisor, Randy Laing, a white male.  After submitting his scheduling availability form, Motto spoke with Laing several times in the ensuing weeks to make sure that his request was approved.  Laing assured Motto on multiple occasions that he would discuss the shift request with Clark, although he made conflicting statements about whether he had yet given the form to Clark for his approval.  PX A at 77-78, 110-11, 115-17, 120-21.

Starting on May 24, 2008, Motto believed his request to change shifts had been granted.  From that date until approximately October 2008, Motto was only required to work shifts that ended by 7:00 p.m.[2]  At no point did Motto's salary decrease, and his assembler position and hours per workweek did not change.  Id. at 126-28, 130.

In March 2008, Minicozzi had also submitted a

_____

[2] On average, once or twice a month between May 24, 2008 and October 2008, Motto would be scheduled to work past 7:00 p.m.  On each such occasion, Laing would say that the scheduling was a mistake and would allow Motto to leave early to attend band rehearsal.  PX A at 126-27.

-4-

scheduling request that he be given dayshift assignments between the hours of 7:00 a.m. and 4:00 p.m.  Minicozzi's request was signed and approved the day it was submitted.  Id. at 125, 172.

Beginning in October 2008, Motto noticed that he was being scheduled to work past 7:00 p.m.  When he brought the issue to Laing's attention, Laing responded that, with the holidays approaching, he needed Motto to work later shifts.  During the holiday season, the store was busier, experiencing higher customer volume, and Motto continued to be scheduled for evening work for the remainder of 2008.  Due to his longer work schedule, Motto was often late to band rehearsal or could not attend rehearsal altogether.  For that reason, around Thanksgiving, the other members of Flight 106 released Motto from the band.  Id. at 130-32, 134.

Also right before Thanksgiving 2008, Clark left his position as store manager for the Temple Wal-Mart.  Id. at 131. On January 13, 2009, Motto had a meeting with the new store manager, Robin Olshenske, and Laing to discuss his shift assignments.  During that meeting, Olshenske checked the computer and informed Motto that his April 2008 shift change request had never been placed into the store's system.  Motto stated that was impossible because he had given the form to Laing.  Laing replied that he had, in turn, submitted the form to Clark.  Two days later, Olshenske notified Motto that she had changed his hours of

-5-

availability in the store's computer system to comply with his
April 2008 availability request.  After January 2009, Motto was
not again scheduled to work past 7:00 p.m.  Id. at 138-42, 146-
48, 150.

C.   Motto's Complaints of Race Discrimination

On March 17, 2009, Motto filed a complaint with the
Pennsylvania Human Relations Commission ("PHRC") and the U.S.
Equal Employment Opportunity Commission ("EEOC"), alleging that
Wal-Mart had engaged in impermissible race discrimination by
failing to adjust formally his work schedule between April 2008
and January 2009.  PX G (3/17/09 PHRC/EEOC Compl.).  Motto filed
his original complaint in this case, alleging the same claim, on
April 4, 2011.  Compl. ¶¶ 18-27 (Docket No. 1).

D.   2009 Performance Evaluation

In February 2009, about a month before Motto filed his
administrative complaint, Laing conducted Motto's yearly
evaluation and told Motto that his work was "excellent."  Four
months later, one of the co-managers of the Temple Wal-Mart told
Motto that the evaluation had not been retained in Motto's
personnel file.  Motto eventually received and signed a form in
July 2009 reflecting the contents of his February evaluation.  It
stated that he had an overall rating of "meets expectations."

-6-

PX A at 177-78, 181.  At the time of his February 2009 evaluation, Motto received a raise, which he believes was based on his rating of "excellent."  Motto's salary did not thereafter go down.  Id. at 179-80; Def't's Reply Ex. A (12/31/09 Motto Earnings History Report).

At some point after issuing this evaluation, and prior to September 2011, Laing left his employment with the Temple Wal-Mart.  PX A at 78, 188.


E.    October 20, 2011 Incident

Over a period of several months in the summer and fall of 2011 and while employed at Wal-Mart, Motto engaged in a sexual relationship with the store's pharmacy department manager, Anita Marburger.  Marburger would often grope Motto at work, and Motto resisted her while at the store.  They also had sex outside of work.  Since 2009, Motto had also been dating another employee at the Temple Wal-Mart, Bonita Campbell.  As far as Motto knows, Campbell was initially unaware of his simultaneous relationship with Marburger.  PX B (5/10/12 Motto Dep.) at 10-12, 14, 31-32. In a conversation that took place at work on October 13, 2011, Marburger broke off their relationship and demanded that Motto go to his car and retrieve a CD that she had let him borrow.  Motto turned and began to walk away from Marburger.  As he did so, Marburger screamed at him and then pushed and hit him in the

back.  Id. at 14-17, 36.

A week later, on October 20, 2011, Campbell approached Motto, crying, and told him that she had just learned from Marburger that Marburger and Motto had been having sex.  Upon hearing that, Motto went looking for Marburger and found her at the employee lockers.  Store associates Alex Cabrera and Linda Balthaser were with Marburger in front of the lockers and assistant manager Mark DeMiere was in a nearby hallway when Motto approached.  Motto pointed at Marburger and loudly told her two times that she "need[ed] to stop" and that she was upsetting his girlfriend.  Id. at 32-33, 36-37.  Motto was shouting and got to within several feet from Marburger.  PX E (7/19/12 Balthaser Dep.) at 12-13.  Cabrera and Balthaser told Motto to "take it easy," and DeMiere pulled Motto into the office of the current store manager, Daniel Hutton, to talk.  PX B at 32-33, 36-37, 39-40.  Hutton, who is Caucasian, had taken over as store manager for the Temple Wal-Mart in 2009.  PX C (7/19/12 Hutton Dep.) at 6; PX B at 64-65.

Once in Hutton's office, Motto asked to call the police.  PX B at 42.  At that time, Motto informed Hutton that Marburger had been sexually harassing him at work.  PX C at 12.  Hutton and DeMiere asked Motto to fill out a statement about the incident that had just occurred.  Officer Scott Geisler arrived at the store and spoke with Motto in the presence of Hutton and

-8-

DeMiere.  Motto told Officer Geisler that he did not swear or threaten Marburger, and DeMiere "looked right at the officer and said, yeah, he was just loud."  PX B at 41-42, 67.  That day, Officer Geisler issued a report regarding Motto's claims that Marburger had assaulted him on October 13 and that she had been sexually harassing him.  The report did not reference the verbal confrontation that had taken place that day.  DX H (10/20/11 Muhlenberg Twp. Police Incident Report Form).

        The same day, Cabrera, Balthaser, and DeMiere wrote statements describing the incident between Motto and Marburger.  Cabrera wrote that Motto approached Marburger while she was placing her purse in her locker.  Cabrera stood between Marburger and Motto, "so he couldn't get to [her]."  According to Cabrera's statement, Motto pointed at Marburger and said "she didn't have to know" and "I am going to get you."  Cabrera then took Marburger outside "for safety reasons" and sat with her in his car until Motto left the store.  DX E (10/20/11 Cabrera Stmt. at 2) (quotation marks omitted).  Balthaser also wrote in her statement that she stood between Motto and Marburger "so he could not get to her," and that Motto told Marburger, "I am going to get you" and "this is not over."  Balthaser further stated that she thought Motto would have tried to hurt Marburger if DeMiere were not present on the scene.  Id. (10/20/11 Balthaser Stmt. at 3) (quotation marks omitted).  In his statement, DeMiere said

that he witnessed Motto "make accusations against Anita," "mak[e] threatening comments," and state that "'he would get her back.'" Id. (10/20/11 DeMiere Stmt. at 2).

F.   Motto's Termination

Wal-Mart Corporate Policy PD-48: Workplace Violence ("Policy PD-48") states that "threats of violence or other similar conduct is unacceptable behavior and is a violation of company policy." DX K at 1. According to Policy PD-48, any employee who violates the policy "will be disciplined up to and including termination from the company." Id. (emphasis omitted).

Hutton investigated the October 20 confrontation between Motto and Marburger. He reviewed the statements written by Cabrera, Balthaser, and DeMiere. He also spoke to Motto and DeMiere about what had happened in front of the employee lockers. DeMiere's written statement accurately reflected his oral description of the event. Hutton determined that Motto's statements that he would "get" Marburger and that "this isn't over" constituted threats of physical harm in violation of Policy PD-48. Although Hutton could feel empathy for Motto, given that Marburger had been making sexual advances at work, he felt that he could not allow Motto to remain an employee after making such threats. On November 1, 2011, Hutton fired Motto for violating Wal-Mart's policy against workplace violence and explained to

Motto the reason for his termination.  PX C at 6-9, 13, 16-18;
DX L (11/1/11 Motto Exit Interview); PX B at 42, 66.

At the time of Motto's termination, Hutton was aware
that Motto had filed an administrative complaint against Wal-Mart
but did not know that Motto had filed a lawsuit in federal court.
PX C at 21.  During Motto's exit interview, there was no mention
of Motto's race or his pending employment discrimination
complaints against Wal-Mart.  PX B at 76-77.

Marburger was likewise terminated on November 1, 2011
for violating Policy PD-48 when she pushed and hit Motto on
October 13.  PX C at 15-16; DX M (11/1/11 Marburger Exit
Interview).  Wal-Mart also conducted an investigation into
Motto's claim of sexual harassment against her.  DX C at 14.


II.  <u>Analysis</u>[3]

Motto alleges that Wal-Mart decided to terminate him on
the basis of his race in violation of Title VII, the PHRA, and
§ 1981, and in retaliation for filing complaints of workplace

---

[3] Summary judgment is appropriate if there "is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving
party bears the initial burden of demonstrating the absence of
any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  The Court must consider the evidence
in the light most favorable to the non-moving party.  Once a
properly supported motion for summary judgment is made, the
burden of production shifts to the non-moving party, who must set
forth specific facts showing that there is a genuine issue for
trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50
(1986).

discrimination, also in violation of § 1981.  In Motto's original complaint, his sole allegation was that Wal-Mart discriminated against him on the basis of race by failing to approve his scheduling availability requests until January 2009.  Compl. ¶¶ 18-27.  Motto also included that claim in his amended complaint, the operative pleading in this action.  Am. Compl. ¶¶ 18-27 (Docket No. 25).  At oral argument, Motto conceded that Wal-Mart's failure to change his shift schedule in its computer system was not a sufficiently adverse employment action to underlie a claim of employment discrimination, and it is, therefore, no longer before the Court.  11/15/12 Hr'g Tr. at 3-4.

For the reasons that follow, the Court concludes that Motto has not carried his burden of demonstrating that his termination was due to either discrimination or retaliation, and Wal-Mart is entitled to summary judgment on both claims.


A.   <u>Discrimination Claim</u>

The parties agree that Motto's Title VII discrimination claim is governed by the familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  That analytical framework applies in equal manner to his claims of race discrimination under § 1981 and the PHRA.  <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 181-82 (3d Cir. 2009); <u>Atkinson v. Lafayette Coll.</u>, 460 F.3d 447, 454 & n.6 (3d Cir. 2006).

Pursuant to the McDonnell Douglas evidentiary scheme, the plaintiff has the initial burden of making out a prima facie case of discrimination.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  A prima facie race discrimination claim requires proof of the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  See Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).

If the plaintiff establishes a prima facie claim, the burden then shifts to the defendant employer to articulate a legitimate, non-discriminatory justification for its conduct. Sarullo, 352 F.3d at 797.  Once the defendant satisfies this requirement, to defeat summary judgment, the plaintiff must demonstrate that the defendant's proffered reason for the employment action was merely pretext for discrimination.  Id.  A plaintiff can do so by submitting evidence that either casts doubt upon the truthfulness of the proffered reason or permits a rational factfinder to infer that discrimination was more likely than not a determinative cause of the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 762, 764-65 (3d Cir. 1994); see

also <u>Anderson v. Wachovia Mortg. Corp.</u>, 621 F.3d 261, 271 & n.7 (3d Cir. 2010).

The first three elements of Motto's prima facie claim are not in dispute.  The parties center their disagreement on the fourth element: whether Motto's termination occurred under circumstances from which discrimination may be inferred.  Wal-Mart puts forth a strong argument that the evidentiary record yields no such inference.  The Court will assume without deciding, however, that Motto is able to cross this initial hurdle.  Even so, Wal-Mart has offered a legitimate, non-pretextual reason for its decision to terminate Motto that he has failed to rebut.

Motto argues that he endured a variety of racially discriminatory conduct while employed at Wal-Mart that suggests Wal-Mart's termination decision was also motivated by race discrimination.  He notes that a colleague, Jay, consistently used a racial epithet in his presence and that his supervisors, Laing and Clark, failed to approve his scheduling requests for almost a full year, whereas they immediately approved a shift change request from a white co-worker, Minicozzi.

Motto also testified at deposition that, according to another employee, Clark once made a racially insensitive comment during a morning meeting that took place prior to Motto's employment at Wal-Mart.  Motto learned that, as a result, Clark

was subsequently disciplined in some fashion for two weeks. Motto also heard from other co-workers that, at another meeting, Clark made derogatory statements about women, for which he later apologized.  PX A at 154-55, 158-59, 161-62.  An initial problem with Motto's reliance on this evidence is that it is hearsay, inadmissible at trial and beyond the scope of what the Court can consider at the summary judgment phase.  See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009); see also Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000).

Putting aside that evidentiary concern, Clark's former statements and the other evidence of possible discrimination bear no relation to the circumstances of Motto's termination in November 2011.  All of the above events took place before Hutton, the person who decided to fire Motto, became store manager and years before that decision was made.  By the time Motto was fired, Clark, Laing, and Jay no longer worked at the Temple Wal-Mart.  Their acts cannot be attributed to Hutton and there is nothing in the summary judgment record to suggest that Hutton expressed any racist sentiments himself.  To the contrary, prior to his termination, Motto stated that he had not encountered any discriminatory behavior from Hutton.  At his first deposition in this action, Motto stated of Hutton, "I don't think he's discriminatory."  PX A at 166-68.  The fact that Motto is black

and Hutton is white is not sufficient to suggest that Hutton's decision to fire Motto was discriminatory.

Moreover, the evidence in the record reflects that Wal-Mart took steps to redress each pre-termination incident of alleged discrimination that Motto identifies. After Motto complained about Jay's use of a racial slur, Wal-Mart management told Motto that he did not need to continue working with Jay and that they would handle the situation. Jay was terminated shortly thereafter. Clark also appears to have been disciplined after making a disparaging racial comment and apologized for his misogynistic remarks. Finally, once Robin Olshenske took over as store manager and learned that Motto's scheduling request had not been formally entered into the computer system, she approved that request. In short, Motto offers little, if any, evidence creating an inference that his termination was due to discrimination on the part of Hutton or Wal-Mart, more generally.

Assuming that Motto does satisfy his prima facie burden for demonstrating discriminatory termination, Wal-Mart had a legitimate reason for letting him go. Hutton concluded that Motto had made a physical threat against Marburger in violation of Wal-Mart Policy PD-48, a terminable offense, based on written statements by Cabrera, Balthaser, and DeMiere, each of whom had witnessed the October 20, 2011 confrontation between Motto and Marburger. In their statements, each of the three witnesses

-16-

asserted that Motto said he was going to "get" Marburger, which
Hutton viewed to be a threat of violence.  DX E.  Cabrera also
stated that he feared for Marburger's safety after Motto
approached her, and both he and Balthaser said that they
physically interposed themselves between Marburger and Motto to
prevent Motto from getting to her.  Balthaser further wrote that
she thought Motto would have attempted to physically harm
Marburger if DeMiere, an assistant manager, had not been present
to defuse the situation.  Id. (Balthaser Stmt. at 3).  In his
written statement, DeMiere described Motto as "threatening"
Marburger.  Id. (DeMiere Stmt. at 2).  Hutton also spoke about
the incident with Motto and DeMiere, whose oral description of
the incident matched his written statement.

Motto argues that there are genuine issues of material
fact as to whether the witnesses fabricated their statements at
the behest of Wal-Mart in order to create a pretextual reason for
firing him.  Nothing beyond his own conjecture substantiates this
contention.

In making this claim, Motto chiefly relies on
discrepancies between DeMiere's written statement and what
DeMiere said to the police officer who came to the Temple store
on October 20 at Motto's request.  Although DeMiere wrote in his
witness report that Motto made threatening comments to Marburger,
according to Motto, DeMiere admitted to Officer Geisler that

Motto "made no threats and that is on his police report."  PX B
at 67.  Motto further claims that he told Officer Geisler in the
presence of Hutton and DeMiere that he had not threatened
Marburger, and that, following that statement, DeMiere turned to
Geisler and "said, yeah, he was just loud."  <u>Id.</u>  Contrary to
Motto's testimony, Officer Geisler's police report does not state
that Motto made no threats against Marburger on October 20, 2011.
It does not even address the altercation that took place on that
date and instead reports on other interactions between Marburger
and Motto, including when Marburger pushed and hit him on October
13.  <u>See</u> DX H.

      Even if DeMiere's response to Officer Geisler differs,
in part, from his written statement, Hutton relied on two other
written statements when he made his determination that Motto had
physically threatened Marburger, and Motto offers no reasonable
basis as to why Hutton should have disregarded those eyewitness
reports.[4]  Minor differences aside, the three Wal-Mart employees

_____

      [4] Motto alleges that Campbell, his former girlfriend, told
him that Cabrera and Balthaser approached her a couple of days
after Motto was terminated and that they told her Motto had not
in fact threatened Marburger on October 20.  PX B at 86-87.  The
Court cannot rely on this double hearsay testimony in considering
Wal-Mart's motion for summary judgment.  <u>See</u> <u>Smith</u>, 589 F.3d at
693.  Even if the statements to Campbell formed part of the
summary judgment record, Motto offers no evidence that Wal-Mart
unduly influenced what Cabrera and Balthaser initially included
in their earlier witness statements or that Hutton was aware of
any contradictions in their description of what happened when he
made the decision to terminate Motto.  Indeed, according to
Motto, Cabrera and Balthaser did not approach Campbell until
after he was fired.

who provided written accounts of the incident described Motto's
statements and conduct in similar fashion.  Most importantly,
both Cabrera and Balthaser stated that Motto said to Marburger,
"I am going to get you," while DeMiere similarly quoted Motto as
saying, "he would get her back."  DX E (quotation marks omitted).
Any minor variation in these written statements does not call
their veracity into question.

Finally, Motto contends that triable issues relating to
pretext exist because he denies making any threat of harm,
because his actions and statements during the verbal altercation
with Marburger could be interpreted in a non-violent manner, and
because Hutton's investigation into the events of October 20 was
faulty.  Pl.'s Opp. at 13-14; 11/15/12 Hr'g Tr. at 14-17.  For
instance, at oral argument, counsel for Motto argued that Hutton
failed to follow various aspects of Wal-Mart's investigatory
policy when he relied on a written witness statement from
Balthaser without separately interviewing her and when he failed
to elicit a statement from Marburger, the target of Motto's
alleged threat.  11/15/12 Hr'g Tr. at 15.

At best, these facts demonstrate that Hutton's
decisionmaking process could have been more thorough and that
reasonable minds could disagree with his conclusion that Motto
made a threat of physical harm.[5]  Motto cannot demonstrate

_____

[5] It is worth noting that, at his deposition, Motto
acknowledged that saying "I'm going to get you . . . is a

pretext with evidence that Hutton's decision was wrong, mistaken, or even incompetent, however.  <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  Rather, Motto must show that Hutton's proffered rationale for termination is a facade, unworthy of belief.  <u>Id.</u> at 1108-09.  He has not done so.  The evidence adduced at this stage would not permit a rational factfinder to conclude that Hutton's decision to fire Motto, based on the evidence presented to him, was unreasonable, let alone that the decision was actually motivated by discriminatory intent.

    B.   <u>Retaliation Claim</u>

Retaliation claims under § 1981, like claims of direct discrimination, are analyzed according to the <u>McDonnell Douglas</u> burden-shifting paradigm.  A prima facie claim of retaliation requires a plaintiff to present evidence that: (1) he engaged in protected activity; (2) the employer took a materially adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  <u>Moore v. City of Phila.</u>, 461 F.3d 331, 340-41 (3d Cir. 2006).  Once the plaintiff establishes a prima facie claim, the employer must come forward with a legitimate, non-retaliatory explanation for its conduct.  <u>Id.</u> at

threat."  PX B at 88.

342.  If it does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is false and the true reason for the adverse action is retaliation.  <u>Id.</u>

Motto engaged in protected activity by submitting a claim of race discrimination against Wal-Mart to the PHRC and EEOC in March 2009 and by initiating the instant lawsuit in April 2011.  His termination also constitutes an adverse employment action.  Motto cannot, however, demonstrate that his complaints and subsequent termination are causally connected.  The Court of Appeals for the Third Circuit has noted that a plaintiff in a retaliation case may demonstrate causation through a "pattern of antagonism" following the plaintiff's protected conduct or unusually suggestive temporal proximity between an employee's protected activity and his termination.  <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir. 1997); <u>see also</u> <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003).  Ultimately, a court must review the record as a whole to determine whether it supports the requisite causal link between protected conduct and adverse action.  <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997).

Motto has not demonstrated that his termination was part of a longstanding pattern of workplace discrimination or harassment.  He cites only one action taken after he first filed his administrative complaint in March 2009 that he considers to

be negative.  Prior to submitting that charge, in February 2009,
Motto underwent a workplace evaluation, during which his
supervisor, Laing, told him that everything was "excellent."  The
initial evaluation form was not retained in Motto's personnel
file, and, when Motto finally received and signed the evaluation
form approximately four months after lodging his complaint with
the PHRC and EEOC, it stated that Motto had a rating of "meets
expectations."  Although Motto believes this rating does not
comport with Laing's oral representation that his work was
"excellent," at his deposition, Motto was unable to say whether
the overall rating on his evaluation sheet had been changed after
his initial meeting with Laing.[6]  See PX A at 177-82.  Even if

---

[6] In his opposition brief, Motto appears to argue that this
alleged change to his evaluation score constitutes an independent
act of retaliation or discrimination.  As Wal-Mart notes, that
claim was never made in either Motto's original or amended
complaint.  Even if it were properly before the Court, Motto
acknowledges that he received a raise after Laing told him in
February 2009 that his work was "excellent."  That salary
increase was not reversed and Motto offers no evidence that he
was ever thereafter denied a raise, bonus, promotional
opportunity, or other workplace advancement due to his "meets
expectations" score.  That being so, any change in his evaluation
is not sufficiently adverse to underlie either a claim of
discrimination or retaliation.  See Storey v. Burns Int'l Sec.
Servs., 390 F.3d 760, 764 (3d Cir. 2004) (An "adverse employment
action" for purposes of a Title VII discrimination claim must
involve "an action by an employer that is serious and tangible
enough to alter an employee's compensation, terms, conditions, or
privileges of employment." (quotation marks and citation
omitted)); Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir.
2008) (finding negative performance review would not support
retaliation claim without evidence that it could affect the
plaintiff's "position, grade level, salary, or promotion
opportunities"); Morrison v. Carpenter Tech. Corp., 193 F. App'x
148, 154 (3d Cir. 2006) (finding a negative performance review,

Laing did alter Motto's evaluation in some respect following the submission of Motto's complaint, he did so more than two years before Motto was fired and the two adverse events are wholly unrelated.  As already noted, Laing was not employed at Wal-Mart's Temple location by the time of Motto's termination and, certainly, played no role in Wal-Mart's termination decision.

There also exists no "unduly suggestive" timing between Motto's charges of racial discrimination and his firing.  Thomas, 351 F.3d at 114 (quotation marks and citation omitted).  Over two years elapsed between the time Motto filed his complaint with the EEOC and PHRC and the date on which he was terminated, and there was a seven-month gap between Motto's initiation of the present suit and his termination.  Both periods of time are too long to raise an inference of causation on their own.  See, e.g., LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (finding gap of three months between protected conduct and adverse action too long to support inference of retaliation without additional evidence); Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007) (lapse of five months between informal complaint of sexual harassment and adverse employment action did not, on its own, create an inference of retaliation).  Moreover, Hutton was not even aware of Motto's more recent initiation of a federal lawsuit when he terminated him.

without more, insufficiently adverse to make out a retaliation claim).

-23-

In his briefing, Motto, for the first time, argues that he also engaged in protected activity when he complained to Hutton, in their conversation in Hutton's office on October 20, 2011, that Marburger had been sexually harassing him.  He is correct that even such informal protests against discrimination trigger protection under civil rights legislation.  <u>Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135 (3d Cir. 2006).  Motto was terminated two weeks after making this complaint.

Although that period between complaint and termination was quite short, there is nothing particularly suggestive about this timing either.  Of course, "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case . . . .  The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."  <u>Kachmar</u>, 109 F.3d at 178; <u>see also</u> <u>Thomas</u>, 351 F.3d at 114 (noting that it is a suggestion of "retaliatory motive" that satisfies the causal element of a retaliation claim (quotation marks and citation omitted)).

It was not until immediately after his altercation with Marburger, and in the course of a conversation pertaining to that event, that Motto told Hutton or any other store manager that she had been harassing him.  Hutton had not yet had time to fully investigate the October 20 incident in front of the employee

lockers and was beginning to gather information when Motto leveled his allegation against Marburger.  The fact that Motto's termination took place the exact same short amount of time after he both complained of sexual harassment and yelled at Marburger that he would "get" her does not suggest that Wal-Mart's employment decision was motivated by Motto's complaint, rather than his arguably threatening comments.  Wal-Mart also investigated Motto's sexual harassment claim once the issue was raised and wound up terminating Marburger, albeit for her own violations of the policy against workplace violence.  In context, this chronology does not suggest anything untoward.  Nor does the record as a whole establish a prima facie causal link between Motto's lawful complaints and his termination.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).

In any event, even assuming that Motto could establish a prima facie case of retaliation, his claim would still falter at the next two stages of the McDonnell Douglas analysis.  As explained above, Wal-Mart had a legitimate, non-retaliatory reason for ending Motto's employment, and Motto has not reasonably presented any genuine issue of material fact demonstrating that the proffered rationale is unworthy of belief.

III. Conclusion

For the foregoing reasons, the Court will grant Wal-

Mart's motion for summary judgment.  An appropriate order issues separately.